# AFFIDAVIT

STEVEN MULLEN, being duly sworn, deposes and states that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations, duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that, located upon THE PREMISES KNOWN AND DESCRIBED AS 191 SOUTH MAIN STREET, ATTLEBORO, MASSACHUSETTS, EXCLUDING THE THIRD FLOOR (the "SUBECT PREMISES") further described in Attachment A, there are the items described in Attachment B, which constitute evidence, fruits and instrumentalities of knowingly making false statements to a Pretrial Services Officer in violation Title 18, United States Code, Section 1001.

Upon information and belief, there is probable cause to believe that, located in the COMPUTERS[1] LOCATED WITHIN THE SUBJECT PREMISES, there are the items described in Attachment C, which constitute evidence, fruits and instrumentalities of knowingly making false statements to a Pretrial Services Officer in violation Title 18, United States Code, Section 1001.

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") for approximately 10 years and am currently assigned to Child Exploitation Investigations Unit. During my tenure with HSI, I have participated in

---

[1] The term "computer" includes the cellular telephone in LEMAY's possession at the time of her arrest on June 20, 2017, and all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, tablets and server computers in the basement, first or second floor of the SUBJECT PREMISES, but specifically does not include cellular telephones belonging to other residents.

numerous child exploitation investigations, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed and analyzed electronic devices, and interviewed witnesses.

2. I am familiar with the facts and circumstances of this investigation from, among other things, my personal participation in this investigation and in other child sexual exploitation investigations, reports made to me by other members of law enforcement, my review of reports prepared by other members of law enforcement, and information obtained from witnesses

3. Where actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

4. Because this affidavit is being submitted for the limited purpose of seeking authorization to search the SUBJECT PREMISES and the COMPUTERS LOCATED WITHIN THE SUBJECT PREMISES, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause for the requested search warrants. Except as set forth below, I have not distinguished herein between facts of which I have personal knowledge and facts as to which I have hearsay knowledge.

## PROBABLE CAUSE

5. On July 7, 2015, JENNIE LEMAY was arrested on a complaint, attached as Exhibit 1, sworn in the Eastern District of New York charging her with conspiring, with Alberto Randazzo, to sexually exploit a child. Subsequently, on October 19, 2015, the grand jury returned a superseding indictment, attached as Exhibit 2, charging her with the same. LEMAY

met Randazzo over the Internet and used various Internet services including Yahoo! Messenger and Skype to commit the crime with which she is charged.

6. On August 24, 2015, over the government's objection, United States District Judge Pamela K. Chen agreed to LEMAY's pretrial release to home detention (at the SUBJECT PREMISES) on a $300,000 bond secured by a $15,000 cash deposit, a property owned by LEMAY and a property owned by her sister. The Court stated that the substantial financial package and the fact that LEMAY was undergoing treatment for pancreatic cancer were key factors in the Court's decision to release LEMAY. The bond included conditions barring LEMAY from having any contact with minors and from using the Internet except to communicate with Pretrial Services, defense counsel, a treatment provider or someone else approved by Pretrial Services.

7. On August 3, 2016 a bond revocation hearing was held as to LEMAY after she violated her pretrial release conditions by attending a Broadway show and visiting Foxwoods Casino in Connecticut without the permission of Pretrial Services. The Court did not remand LEMAY, but stated that any future violation would result in her arrest and revocation of her bond. The minute entry from the hearing reads, "Court warns defendant that any future failure to comply with all conditions of release will result in Defendant's remand into custody and revocation of her bond."

8. On May 19, 2017, the victim's social worker contacted me to alert me that LEMAY had created a new Facebook page under the pseudonym "Molly Mansion", which he had learned from the victim's mother, Winter Sargent, who is LEMAY's estranged daughter. On May 20, 2017, I contacted Ms. Sargent who explained that on Mother's Day 2017 (Sunday, May

14, 2017), she received a "friend request" from the Molly Mansion Account, and she knew immediately it was LEMAY because "Molly" is the name of LEMAY's dog who died and "Mansion" is what LEMAY calls the large Victorian home in which she lives.

9. I then reviewed publicly available pages of the Molly Mansion Account and observed photographs of LEMAY and LEMAY's sisters. I also observed that the Facebook page listed 14 "friends," several of whom I know from the investigation to be LEMAY's friends and relatives. These friends included all LEMAY's sisters, including Bessie Sargent and Patti Weatherford —both of whom signed LEMAY's bond; her close friend and former co-worker Bethanny Lauzon and Ms. Lauzon's fifteen-year-old daughter, Edie; and a man named Mark Taylor, with whom LEMAY had a sexual relationship with from at least September 2013 through January 2014.

10. On May 23, 2017, Massachusetts Pretrial Services Officer Michael Forman conducted an unannounced home visit to LEMAY at the SUBJECT PREMISES. LEMAY admitted maintaining an Internet connection for her tenants, but denied having any Internet-capable devices, and said she does not access the Internet.

11. On June 1, 2017, I interviewed Ms. Lauzon in person. Ms. Lauzon confirmed that she has been Ms. Lemay's friend for 20 years. Ms. Lauzon confirmed that the Molly Mansion Account belongs to LEMAY and that she first received a friend request from the Molly Mansion Account in or around December 2016. Ms. Lauzon also explained to me that "Molly" is a reference to LEMAY's deceased dog and that "Mansion" is what LEMAY calls her home. Ms. Lauzon added that a picture of a tree on the Molly Mansion Account profile page is picture of a tree in Lemay's backyard. Ms. Lauzon confirmed that Edie Lauzon is her daughter and that she

4

is a minor. I asked Ms. Lauzon about another of the friends on the Molly Mansion Account—Nicole Lafebvre. Ms. Lauzon explained that Ms. Lafebvre is a friend of Ms. Lauzon's who runs a direct-sale home business for LuLaRoe, selling women's clothing, and that LEMAY had purchased clothing from Ms. Lafebvre.

12. On June 5, 2017, Eastern District of New York Pretrial Services Officer Michael Ilaria spoke with LEMAY and she again denied accessing the Internet at all since her release. She also specifically claimed not to have accessed Facebook since her release and said she had "never even heard the name 'Molly Mansion.'"

13. On June 7, 2017, I interviewed Ms. Lefebvre by telephone. Ms. Lefebvre has known LEMAY casually for the past 10 years, through her own friendship with Ms. Lauzon. Ms. Lefebvre confirmed she owns a direct-sale business through LuLaRoe. Ms. Lefebvre explained that customers are invited to her Facebook group and she will conduct live events where she posts items of clothing that are available for sale and if someone wants a piece they will write "sold." Ms. Lefebvre confirmed that the Molly Mansion Account was used to make several purchases. Initially she did not know who "Molly Mansion" was but believes that Ms. Lauzon told her the Molly Mansion Account belonged to Jennie Lemay. Ms. Lefebvre provided several email receipts that she sent to LEMAY after LEMAY made purchases through the Molly Mansion Account. (See Exhibit 5, emails between Ms. Lefebvre and jenjenlemay@gmail.com.) These receipts include LEMAY's full name and the address where LEMAY currently resides. Ms. Lefebvre also noted that she provided the items LEMAY purchased to Ms. Lauzon for Ms. Lauzon to deliver to LEMAY.

14.     On June 7, 2017, I again interviewed Ms. Lauzon, this time by phone. Ms. Lauzon explained that when Ms. Lefebvre started her business a few months ago, Ms. Lefebvre asked her to refer Facebook friends who might be interested in the clothing to Ms. Lefebvre's Facebook group. Ms. Lauzon referred Jennie Lemay, under the Molly Mansion Account, to Ms. Lefebvre. Ms. Lauzon explained that Ms. Lefebvre provided her with three items of clothing—a dress, a t-shirt and a pair of leggings[2]—to deliver to LEMAY. Ms. Lauzon said she delivered the dress and t-shirt to LEMAY, at LEMAY's home, during the week of May 22, 2017. LEMAY told Ms. Lauzon she could keep the leggings, a picture of which is attached as Exhibit 6. Ms. Lauzon noted that she had tried to locate the Molly Mansion Account over the past few days but that it appeared to have been taken down.

15.     On June 8, 2017, I verified that the Molly Mansion Account is no longer accessible, indicating that it was deleted or deactivated at some point between May 30, 2017 and June 8, 2017.

16.     I have received information that the SUBJECT PREMISES currently has three residents in addition to LEMAY. LEMAY's sister, Patti Ellis, and her husband reside in the basement of the SUBJECT PREMISES. A tenant of LEMAY's resides on the third floor. A probation officer has advised me that, based on a May 2017 home visit, the basement is contiguous with the rest of the home and can be entered from the first floor. On the first floor is a kitchen, living room and dining room and on the second floor are several bedrooms and a bathroom. When the probation officer conducted his visit, the basement door was open on the first floor and Patti Ellis was in the living room on the first floor. The probation officer also

---

[2] The three email receipts provided by Ms. Lefebvre correspond to these three items.

stated that the third floor is entered through a door on the second floor landing. The probation officer stated that there was a lock on the door to the third floor. The probation officer also stated that LEMAY resides on the first and second floor of the home.

17. The same probation officer has advised me that LEMAY has no computers approved by the Probation Department and that he has not viewed a computer in the first or second floors of the SUBJECT PREMISES. However, on May 23, 2017, he did observe router equipment in the living room on the first floor of the premises. The probation officer stated that Patti Ellis informed him that Ellis and her husband have several electronic devices, including smartphones and a tablet computer. Based on the fact that LEMAY has no approved electronic devices, but Ellis does possess computers within the SUBJECT PREMISES, there is probable cause to believe that the computers used by LEMAY are in the basement of the SUBJECT PREMISES.

18. On June 20, 2017, LEMAY was arrested at the SUBJECT PREMISES by the United States Marshal's Service. At the time of her arrest, HSI agents observed LEMAY in possession of a cellular telephone, which she threw under the comforter on her bed.

19. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

> a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new

computer.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

20. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a. The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b. Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of

computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere. If agents seize more than one computer but, upon off-site analysis of the forensic images of those computers, determine that one or more of them appears to contains no data within the scope of the search warrant, they will promptly return that/those original seized computer(s).

21. The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their

true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## THE SUBJECT PREMISES

22. A photograph and description of the SUBJECT PREMISES is attached hereto as Attachment A. The SUBJECT PREMISES is located at 191 South Main Street, Attleboro, Massachusetts. The SUBJECT PREMISES is a detached, brick, three story wood frame house, which is blue-green and color and has cream-colored trim. There is a sign with the numbers 191 South Main near the end of the walkway at the mailbox.

23. LEMAY has been residing on GPS-monitored home detention at the SUBJECT PREMISES since on or about August 24, 2015.

24. Based on my training, experience and knowledge of this investigation, there is probable cause to believe that there are COMPUTERS within the SUBJECT PREMISES that LEMAY is using to access the Internet and that COMPUTERS LOCATED WITHIN THE SUBJECT PREMISES will constitute evidence, fruits and instrumentalities of knowingly making false statements to a Pretrial Services Officer in violation Title 18, United States Code, Section 1001, when she claimed—on two occasions—not to have used the Internet since being placed on home detention.

## SEALING

25. Due to the nature and contents of this affidavit, the revelation of which would compromise an ongoing investigation, and given that public disclosure of the warrants before their execution would allow for destruction of evidence, the affiant requests that this affidavit be filed and maintained under seal, until further order of the Court. In addition, the affiant requests

that the search warrant be filed under seal and remain under seal until the execution of the warrant.

## CONCLUSION

26.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that within the SUBJECT PREMISES there exists evidence of crimes. Accordingly, a search warrant for the SUBJECT PREMISES is requested.

27.    Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that within the COMPUTERS LOCATED WITHIN THE SUBJECT PREMISES there exists evidence of crimes. Accordingly, a search warrant for the COMPUTERS LOCATED WITHIN THE SUBJECT PREMISES is requested.

WHEREFORE, your deponent respectfully requests that the requested search warrants be issued for THE PREMISES KNOWN AND DESCRIBED AS 191 SOUTH MAIN STREET, ATTLEBORO, MASSACHUSETTS and for the COMPUTERS LOCATED IN THE PREMISES KNOWN AND DESCRIBED AS 191 SOUTH MAIN STREET, ATTLEBORO, MASSACHUSETTS, EXCLUDING THE THIRD FLOOR.

_____
Steven Mullen
Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me this
20th day of June, 2017

_____
THE HONORABLE JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

# ATTACHMENT A
## Property to Be Searched

The SUBJECT PREMISES is located at 191 South Main Street, Attleboro, Massachusetts. This warrant authorizes a search of the SUBJECT PREMISES excluding the third floor. The SUBJECT PREMISES is a detached, brick, three story wood frame house, which is blue-green and color and has cream-colored trim. There is a sign with the numbers 191 South Main near the end of the walkway at the mailbox. The following photograph shows the specific location of the SUBJECT PREMISES:



**ATTACHMENT B**
Property to be Seized from the SUBJECT PREMISES

ITEMS TO BE SEIZED FROM THE SUBJECT PREMISES, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code Sections 1001:

All computers used by LEMAY; the term "computer" includes the cellular telephone in LEMAY's possession at the time of her arrest and all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, tablets and server computers in the basement, first or second floor of the SUBJECT PREMISES.

Records and other items that evidence ownership or use of computers by LEMAY found within the SUBJECT PREMISES, including, but not limited to, sales receipts, service agreements, invoices, printed emails, and handwritten notes; and

During the course of the search, photographs of the searched premises may also be taken to record the condition thereof and/or the location of items therein.

# ATTACHMENT C
## PROPERTY TO BE SEIZED FROM THE COMPUTERS LOCATED WITHIN THE SUBJECT PREMISES

ITEMS TO BE SEIZED FROM THE COMPUTERS USED BY LEMAY (AS DEFINED IN ATTACHMENT B) LOCATED WITHIN 191 SOUTH MAIN STREET, ATTLEBORO, MASSACHUSETTS (the "COMPUTERS"), for the time period of December 1, 2016, to the present, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code Section 1001:

All information obtained from the COMPUTERS used by LEMAY will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1001, including:

a. Evidence of the use of the COMPUTERS by LEMAY to access the Internet, including, but not limited to, evidence of use of any email program or social media website, such as Facebook and evidence of use of the COMPUTERS by LEMAY to conduct online shopping transactions;

b. Names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, and other electronic media constituting evidence, fruits or instrumentalities of violations of Title 18, United States Code, Section 1001;

c. Evidence of user attribution showing who used or owned the COMPUTERS used by LEMAY at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and history of communications through the Internet;

d. Evidence of the attachment to the COMPUTERS used by LEMAY to other storage devices or similar containers for electronic evidence;

e. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS used by LEMAY;

f. Evidence of the times the COMPUTERS used by LEMAY were used;

g. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS used by LEMAY; and

h. Contextual information necessary to understand the evidence described in this attachment, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1001.